JDN

WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

James Ray Hunter,

Plaintiff,

v.

Theodora Paul, et al.,

Defendants.

No. CV-24-02068-PHX-JAT (CDB)

**ORDER**

Plaintiff James Ray Hunter, who is currently confined in the Arizona State Prison Complex (ASPC)-Yuma, Cibola Unit, brought this pro se civil rights action under 42 U.S.C. § 1983 against Dr. Theodora Paul, Nurse Practitioner (NP) Oyuki Coronado, and NP Xan Pfingston.  (Doc. 8.)[1]  Before the Court is Defendants' Motion for Summary Judgment, which Plaintiff opposes.  (Docs. 37, 66.)  The Court will grant the Motion in part and deny it in part.

## I.    Background

In his Third Amended Complaint, Plaintiff alleged Defendants provided inadequate post-operative ("post-op") care following his March 8, 2021 hip replacement surgery. (Doc. 8.)  Plaintiff alleged that Defendants assessed Plaintiff's worsening and severe leg swelling and burning pain as simply post-op swelling.  (*Id.*)  Approximately 2 1/2 weeks after surgery, the severe swelling caused the surgical staples in Plaintiff's leg and hip to

---

[1] Plaintiff initiated this action in Maricopa County Superior Court, and Defendants removed the case to federal court.  (Doc. 1, No. CV2023-005229.)

burst open, and fluid and pus drained out. (*Id.*)  Plaintiff was returned to the surgeon, who recommended a second surgery to clean out the infection as soon as possible. (*Id.*)  Plaintiff did not receive the necessary surgery until April 19, 2021. (*Id.*)  Plaintiff further alleged that, thereafter, he became very ill and was finally sent to the hospital, where he was treated for sepsis and a kidney infection that resulted from his original, untreated infection. (*Id.*)

On screening, the Court determined that Plaintiff sufficiently stated Eighth Amendment medical care claims against Defendants Dr. Paul, NP Coronado, and NP Pfingston in their individual capacities. (Doc. 12.)

Defendants move for summary judgment on the grounds that Plaintiff cannot demonstrate deliberate indifference by any of the Defendants and Plaintiff has not suffered any injury attributable to Defendants. (Doc. 37.)[2]

**II.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine v. Fritz Co., Inc.,* 210 F.3d 1099, 1102–03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250

---

[2] Upon the filing of Defendants' Motion for Summary Judgment, the Court issued an Order with the Notice required under *Rand v. Rowland,* 154 F.3d 952, 960 (9th Cir. 1998) (en banc), which informed Plaintiff of the requirements under Federal Rule of Civil Procedure 56 and set a briefing schedule. (Doc. 38.)

(1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  The Court is required to consider only the cited materials, but it may also consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).  Further, where the nonmovant is pro se, the Court must consider as evidence in opposition to summary judgment all of the pro se litigant's contentions that are based on personal knowledge and that are set forth in verified pleadings and motions.  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *see Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995).

**III.    Evidentiary and Procedural Issues**

Defendants argue that Plaintiff's Statement of Facts does not comply with the rules of procedure or the Court's *Rand* Order and, consequently, their facts should be deemed undisputed and, based on those undisputed facts, summary judgment should be granted in their favor.  (Doc. 71 at 2–4.)

Plaintiff's Statement of Facts Opposing Defendants' Statement of Facts does not include paragraphs corresponding to each of the paragraphs within Defendants' Statement of Facts as required under Local Rule of Civil Procedure 56.1(b).  Instead, Plaintiff includes four paragraphs that set out disputes to four specific asserted facts made by Defendants, however, Plaintiff only identifies one of Defendants' numbered paragraphs to which he objects.  (Doc. 67 at 1–2.)

The Court may only consider a fact asserted by Defendants in their Statement of Facts if that fact is properly supported by citation to admissible evidence in the record. Fed. R. Civ. P. 56(c)(1)(A). If a fact is not properly supported, the Court does not consider it, even if the nonmovant fails to respond to or dispute that fact. *See Nissan*, 210 F.3d at 1102 (if the movant fails to carry its initial burden of production, the nonmovant has no obligation to produce anything). Therefore, even though Plaintiff did not file a complete separate statement of facts responding to each of the paragraphs in Defendants' Statement of Facts, on this record the Court cannot automatically deem all of Defendants' facts as true.

Further, some of the paragraphs within Defendants' Statement of Facts include citations that are insufficient to properly support the asserted fact therein. A number of Defendants' citations are simply to "Ex. A," "Ex. B," or "Ex. D," with no page numbers. (*See e.g.*, Doc. 35 ¶¶ 11–12, 43, 45–47, 58.) Exhibit A contains 77 pages (Doc. 35-1 at 1–77), Exhibit B contains 378 pages (Doc. 35-2 at 1–378), and Exhibit D contains 287 pages. (Doc. 35-4 at 1–287.) The Court is "not required to comb the record" to find supporting evidence. *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001); *see S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) ("[g]eneral references without page or line numbers are not sufficiently specific"). Plaintiff was not required to respond to insufficiently supported asserted facts. *See Nissan Fire*, 210 F.3d at 1102–03. And the Court does not consider any asserted fact if the supporting evidence is not readily found.

Regardless, because Plaintiff is a pro se litigant, he is afforded some leeway in the application of the rules governing summary judgment. The Ninth Circuit has directed district courts to "construe liberally motion papers and pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). As stated, district courts must also consider a pro se litigant's verified pleading and any sworn statements in opposition to summary judgment. *See Jones*, 393 F.3d at 923. In support of his Statement of Facts Opposing Defendants' Statement of

Facts, Plaintiff attaches his verified Third Amended Complaint, which sets forth detailed factual assertions; affidavits disputing identified portions of Defendants' declarations; copies of Health Needs Requests (HNRs); and copies of grievance documents. (Doc. 67-1 at 4–36, Exs. B–E; *Id.* at 42–53, Exs. I–K.) Plaintiff's Response filings sufficiently set forth disputes with Defendants' asserted facts.

Accordingly, Defendants' argument that summary judgment should be granted based on Plaintiff's failure to strictly comply with the rules of procedure will be denied.

**IV.   Relevant Facts**[3]

On March 8, 2021, Plaintiff underwent a right hip replacement at Banner Baywood Medical Center. (Doc. 35 ¶ 1.) Upon discharge, Plaintiff was ordered to continue with his regular medications for high blood pressure, high cholesterol, enlarged prostate, low iron, and low potassium, and he was prescribed oxycodone and aspirin. (Doc. 35-1 at 3–4.) Plaintiff was scheduled for a March 25, 2021 follow-up appointment with the surgeon. (*Id.* at 6.)

On the night of March 9, 2021, Plaintiff returned to the prison's Stiner Unit. (Doc. 35-2 at 2.) Plaintiff was placed into a single cell and left in his wheelchair, which he could not get out of by himself. (Doc. 67 ¶ 2.) Plaintiff remained in the wheelchair until he was placed in the infirmary the next morning. (*Id.*) The medical record shows that Plaintiff was not prescribed aspirin, oxycodone, ferrous sulfate (iron supplement), and potassium chloride. (Doc. 35-2 at 5–6.) Plaintiff already had a prescription for ibuprofen, and Nurse Angela White added a prescription for Tylenol 3 that was valid until March 15, 2021. (*Id.*) Nurse White documented that Plaintiff was "stable" and that he was given a urinal, walker, and wheelchair; and was authorized to have meals in his living quarters. (*Id.* at 5–7.)

On March 10, 2021, Defendant NP Coronado issued an order for Plaintiff to go to

---

[3] Plaintiff sets forth asserted facts and argument related to the allegedly unconstitutional conditions of confinement in the infirmary, which he claims caused the serious infection in his leg and hip that led to sepsis. (*See* Doc. 66 at 3, 6.) The Court dismissed Plaintiff's conditions of confinement claim at the screening stage. (Doc. 12 at 12–14.)

the infirmary, or "IPC," and she prescribed Aspirin and Tylenol 3. (Doc. 35-4 at 16, 18.)[4] The IPC is in the Lewis Complex Medical Hub.

On March 10, 2021, around 10:30 a.m., Plaintiff was admitted to the IPC. (Doc. 35-2 at 22; Doc. 67 ¶ 2.) Plaintiff claims he was placed into a dirty and filthy cubicle with an unsanitized bed. (Doc. 67-1 ¶¶ 24–28.) Nurse Kimberly Branum documented that, upon his admission, Plaintiff denied pain and stated he received some pain medication "on the yard." (Doc. 35-2 at 22.)

On March 11, 2021, Plaintiff saw Defendant NP Coronado. (Doc. 35-4 at 20.) NP Coronado documented that Plaintiff reported feeling much better with controlled pain since arriving at the IPC. (*Id.*) NP Coronado ordered labs. (*Id.* at 28, 34.)

Also on March 11, 2021, Nurse Dawn Holt documented that Plaintiff rated his pain as 5/10, but tolerable. (Doc. 35-2 at 33.) Nurse Holt documented that Plaintiff ambulated around the room with his walker with a slow and steady gait and was able to do some flexion/extension exercises. (*Id.* at 34.) Nurse Holt assessed "altered comfort r/t [related to] surgical incision. Risk for infection r/t surgical incision." (*Id.* at 38.)

Later on March 11, 2021, Nurse Karlene Chin-Loy documented that Plaintiff rated his pain at 4/10 and reported that he was trying to use the walker more and did not need the wheelchair. (Doc. 35-2 at 42.) Nurse Chin-Loy assessed "at risk for infection r/t right hip replacement." (*Id.* at 47.)

On March 12, 2021, Nurse Holt documented that Plaintiff rated his pain at 5/10 at his incision site and reported he was "just kind of sore." (Doc. 35-2 at 51.) Plaintiff was assisted out of bed and was able to ambulate down the hallway. (*Id.* at 52.) Nurse Holt assessed "risk for infection r/t surgical incision. Altered comfort r/t (R) hip replacement." (*Id.* at 56.)

---

[4] Defendants assert that, on March 10, 2021, Defendant NP Coronado had an encounter with Plaintiff, spoke with him, and tried but was unable to assess his surgical site because Plaintiff was unable to get up from the bed, even with officers' assistance. (Doc. 35 ¶ 6.) Plaintiff asserts that he did not have an encounter with NP Coronado March 10, 2021, nor did officers attempt to help lift him. (*See id*; Doc. 67 ¶ 1.)

On March 12, 2021, around 5:30 p.m., Plaintiff saw Defendant Dr. Paul. (Doc. 35-6 at 2.) Dr. Paul documented Plaintiff's report that he was feeling better. (*Id.*) Dr. Paul noted that the surgical dressing was clean, dry, and intact, and that the plan was to continue with current plan of care. (*Id.* at 6.)

Later on March 12, 2021, Nurse Chin-Loy documented Plaintiff's report that he sat in the chair for a few hours that day and it "felt good." (Doc. 35-2 at 60.) Nurse Chin-Loy assessed "at risk for infection r/t surgical incision." (*Id.* at 65.)

On March 13, 2021, Nurse Holt documented that Plaintiff rated his pain at 5/10 and reported "having a little pain." (Doc. 35-2 at 78.) Nurse Holt assessed "altered comfort r/t surgical incision. Risk for infection r/t surgical incision." (*Id.* at 83.) Nurse Holt also noted that she taught plaintiff the signs and symptoms of infection. (*Id.* at 85.)

Later on March 13, 2021, Plaintiff complained of acute pain in his right hip. (Doc. 35-2 at 69.)

On March 14, 2021, Nurse Holt documented that Plaintiff complained of incision pain and rated it 4/10. (*Id.* at 87.) In the afternoon, Nurse Holt noted that Plaintiff used the restroom on his own and was able to ambulate with a walker down the hallway. (*Id.* at 88.) At this time, Plaintiff rated his pain at 6/10. (*Id.*) Nurse Holt assessed "Altered comfort r/t surgical incision. Risk for infection r/t surgical incision." (*Id.* at 92.)

On March 15, 2021, previously ordered labs came back abnormal, and included—among other abnormalities—low lymphocytes (a type of white blood cell). (Doc. 35-4 at 29.)

On March 15, 2021, Plaintiff's right leg began to swell and become painful. (Doc. 67-1 ¶ 31.) Plaintiff's entire leg was swollen, aching, and burning. (Doc. 67 ¶ 3.) Also, Plaintiff was struggling to get in and out of bed on his own, he was in excruciating pain when he had to use the walker to get to the bathroom, and he required assistance putting on his pants and shoes. (*Id.* ¶ 4; Doc. 67-1 ¶ 33.) Despite his condition, Nurse Branum documented that Plaintiff rated his pain at 4/10 and reported he was getting better every day. (Doc. 35-2 at 104.) Nurse Branum assessed "acute pain r/t surgical procedure;

impaired mobility." (*Id.* at 109.)

Later that day, at 10:00 a.m., Plaintiff saw Defendant Dr. Paul. (Doc. 35-6 at 8.) The parties dispute what transpired at this encounter. Plaintiff stated he immediately informed Dr. Paul that his right leg was swollen, aching, burning with pain, and infected, and in response, Dr. Paul adamantly claimed it was not infected and that the swelling was only post-op fluid that would drain on its own. (Doc. 67-1 ¶ 37; Doc. 67-1 at 48.) In the medical record, Dr. Paul documented that Plaintiff reported he had been performing his own activities of daily living and showered, and that he asked for a pair of crutches. (Doc. 35-6 at 8.) Dr. Paul documented a plan to continue with the current plan of care. (*Id.* at 12.)

On March 16, 2021, Plaintiff saw Defendant Dr. Paul. (Doc. 35-6 at 14.) Dr. Paul documented that Plaintiff reported no changes since the day before. (*Id.*) Dr. Paul removed the surgical dressing and noted 38 staples with normal skin color and no swelling, drainage, or bleeding. (*Id.* at 14–15.) Dr. Paul renewed the prescription for Tylenol 3 for seven days and issued a special needs order (SNO) for Plaintiff to have meals in his quarters. (Doc. 35-4 at 32, 38.)

Later on March 16, 2021, Nurse Branum documented that Plaintiff was to be released from IPC, and that he would be given an SNO for a wheeled walker and crutches. (Doc. 35-6 at 21–22.)

On March 17, 2021, around 7:00 a.m., Nurse Branum documented that Plaintiff departed IPC. (Doc. 35-2 at 121.) Nurse Branum wrote that Plaintiff showed no signs or symptoms of acute distress, but he requested and was given Tylenol 3. (*Id.*) Even though she wrote that Plaintiff showed no signs of acute distress, Nurse Branum assessed "acute pain r/t surgical procedure; impaired mobility." (Doc. 35-6 at 25.)

On March 18, 2021, Nurse Mary Henderson documented a follow up on right hip surgery and that 38 staples were intact on right hip down right thigh with no drainage or redness. (*Id.* at 127.)

By March 19, 2021, in addition to his right leg, Plaintiff's left leg began to swell.

(Doc. 67-1 ¶ 43.)

On or around March 21, 2021, Plaintiff claims he went to sick call at Stiner Unit and saw Defendant NP Coronado, who looked at Plaintiff's leg and asked him, "what did Complex [Medical Hub] tell you about the swelling?" (Doc. 67-1 ¶ 45.) Plaintiff responded that Complex Medical told him it was post-op swelling. (*Id.* ¶ 46.) NP Coronado agreed and said it appeared to be post-op swelling. (*Id.*) Plaintiff requested something to ease the burning nerves and pain he had in both legs, and NP Coronado gave him Absorbase Skin Cream and renewed his Tylenol prescription. (*Id.* ¶ 47.) Plaintiff returned to (Stiner) medical in the afternoon complaining about burning pain, and NP Coronado gave him some Tylenol and advised him the swelling would go down in 3–5 days if he elevated his legs. (*Id.* ¶ 48.)

Defendant NP Coronado avers, however, that she did not see Plaintiff between March 11 and March 26, 2021. (Doc. 35-3 at 3, Coronado Decl. ¶¶ 9–10.) The medical records reflect that Defendant NP Coronado "reviewed" Plaintiff's March 22, 2021, encounter on March 25, 2021. (Doc. 35-2 at 151.)

On or around March 22, 2021, both of Plaintiff's legs and feet were so swollen that he could not fit into his tennis shoes. (Doc. 67-1 ¶ 44.) At 1:30 a.m. on March 22, 2021, a medical Incident Command System (ICS, which is initiated in an emergency) was called, and Plaintiff was brought to medical. (Doc. 35-2 at 133.) Nurse White documented Plaintiff's report that his legs were swollen and burning, that his legs were throbbing and he could not sleep, that he had blisters on his feet, and that his pancreas hurt. (*Id.*) Nurse White documented her observation that Plaintiff's legs were swollen bilaterally, with swelling on the right leg up past the incision with large blisters forming on the top of the right foot, and left leg swelling up to the knee. (*Id.* at 134.) Nurse White documented that Plaintiff's pain was acute and burning, and at 8/10. (*Id.* at 133.) In the "Plan Notes," Nurse White wrote "discussed with Provider: Lasix 20 [diuretic/water pill], CBC/CMP [complete blood count/comprehensive metabolic panel] Stat, follow up with nurse next day and NP the following day." (*Id.* at 139.) The medical record notes that Nurse White had contacted

NP Johnson, the "provider," at 2:14 a.m. (*Id.* at 140.)

Plaintiff states that, after the ICS was called, he was brought to the Lewis Complex Medical Hub because NP Coronado and the Stiner medical clinic staff were gone for the day. (Doc. 67-1 ¶¶ 50, 52–53.) At the Medical Hub, Plaintiff claims Defendant Dr. Paul was still on site working, and she eventually came over and looked at Plaintiff's legs, squeezed his leg and feet, and told him that it was just post-op swelling. (*Id.* ¶ 54; Doc. 67-1 at 33, Pl. Aff.) Plaintiff became angry and told her, "Look lady, this ain't no post-op swelling. I've had hip surgeries before and this never happened." (Doc. 67-1 ¶ 54.) Dr. Paul yelled back at Plaintiff that she had been a doctor for over 20 years and knew what she was talking about. (*Id.* ¶ 55.) In her declaration, Dr. Paul avers that she was not present or involved in the ICS response and did not evaluate Plaintiff that day. (Doc. 35-5 at 4, Paul Decl. ¶ 16.)

On March 22, 2021, around 2:30 a.m., blood was drawn for labs. (Doc. 35-2 at 148.) The CBC lab results, dated 9:59 a.m., March 22, 2021, showed that a number of Plaintiff's measures were low, including red blood cells and lymphocytes (white blood cells). (*Id.* at 159.) The metabolic panel results showed that Plaintiff's potassium was below normal. (*Id.* at 160.)

On the night of March 23, 2021, Plaintiff was seen by Nurse Shelly Saunders to reassess leg swelling. (*Id.* at 153.) Nurse Saunders noted that Plaintiff's bilateral lower extremities had non pitting edema (swelling where the skin does not indent after pressure is applied). (*Id.*)

On March 24, 2021, Plaintiff saw Nurse Monica Lipford to have the blisters on his foot examined. (*Id.* at 162.) Nurse Lipford noted Plaintiff's report that the blisters popped the day before. (*Id.*) Nurse Lipford documented that Plaintiff had right leg swelling, that "per patient, leg and foot are swollen," and she noted that Plaintiff was to have a follow up with a provider as well as a return visit to the surgeon on March 25, 2021. (*Id.*)

On March 25, 2021, Defendant NP Coronado ordered labs for a potassium recheck. (Doc. 35-4 at 48.) The results showed that Plaintiff's potassium was within normal limits.

(*Id.* at 58.)

On March 25, 2021, Plaintiff was scheduled for his offsite follow up at the surgery location, with PA Whatcott. (Doc. 35-1 at 25). Plaintiff could not wear his shoes due to the large blisters on his feet that were filled with fluid. (Doc. 67-1 ¶ 60.) Plaintiff went through a standard strip search before his departure, and, as he put his pants back on, his right leg burst open at the site of the staples and fluids and puss poured down his leg, soaking his boxers, pants, and sock. (*Id.* ¶¶ 62–63.) Fluids continued to pour out of Plaintiff's wound as officers brought Plaintiff back to the Medical Hub, where nurses unsuccessfully tried to stop the flow with gauze pads. (*Id.* ¶¶ 64–65.) Plaintiff claims the Medical staff called PA Whatcott, who instructed them to pack the wound as best they could and immediately transport Plaintiff to his clinic. (*Id.* ¶ 77.)

At the clinic, Plaintiff claims his surgeon informed Plaintiff he had a "huge infection" at the surgical area. (Doc. 35-4 at 70.) Plaintiff claims PA Whatcott removed the staples that he could reach above the swelling and informed Plaintiff that he would have to go back in and do a "clean out" surgery to scrape out the infection as soon as possible. (Doc. 67-1 ¶ 78.) Plaintiff was scheduled for a follow-up with PA Whatcott in two weeks (Doc. 35-1 at 6). Plaintiff claims he was told that the surgery should be done within two weeks. (Doc. 67-1 at 48–49.) On the Centurion Practitioner Consultation Report form, PA Whatcott noted, "wound drainage 2 wks s/p [following] R hip replacement, bulky dressing applied today. Staples left in place for now." (Doc. 35-1 at 25.)[5] PA Whatcott recommended dressing changes with bulky gauze at least twice a day, doxycycline (antibiotic) 100 mg twice a day for 10 days, and follow up in one week. (Doc. 35-1 at 25.)

Upon his return to prison following the appointment with PA Whatcott, Plaintiff saw Nurse Saunders, who documented that Defendant NP Coronado gave a verbal order for doxycycline and dressing changes, and the first dose of doxycycline was given to

---

[5] Defendants did not submit the medical record from the March 25, 2021 appointment with PA Whatcott. They only submitted the one-page Centurion form that offsite practitioners fill out. (Doc. 35-1 at 25.)

Plaintiff, along with an ABD pad and tape for an evening dressing change. (Doc. 35-4 at 39, 45.)

Also on March 25, 2021, Defendant NP Coronado reviewed the metabolic panel results and documented "abnormal results noted – FU [follow up] labs ordered." (Doc. 35-2 at 150–151.)

On March 26, 2021, Plaintiff saw Defendant NP Coronado for follow up. (Doc. 35-4 at 70.) Plaintiff reported to NP Coronado that he felt okay, he knew the area was infected before, but nobody listened to him, and the surgeon told him he had an infection at the surgical area. (*Id.*) NP Coronado assessed cellulitis of right lower limb, and she ordered wound care, CBC and potassium labs, and follow up in one week. (*Id.* at 74.)[6] Later that evening, NP Coronado was present when Nurse Henderson conducted a dressing change. (*Id.* at 84.)

On March 26, 2021, the CBC lab results showed high white blood cell count and neutrophils (a type of white blood cell), and low lymphocytes. (Doc. 35-4 at 59.) On March 31, 2021, Defendant Coronado reviewed the CBC lab results and documented "abnormal results noted – FU [follow up] labs ordered." (Doc. 35-2 at 148–149; Doc. 35-4 at 77.)

On March 27, 2021, Defendant NP Coronado prescribed Extra Strength Tylenol. (Doc. 35-4 at 98.)

Meanwhile, Plaintiff continued to receive dressing changes two—sometimes three—times a day to change the soaked gauze. (Doc. 67-1 ¶ 82.) At a dressing change on March 30, 2021, Nurse Fareeda Mahmoud noted edematous to upper incision site, oozing serous sanguineous fluid, and bilateral swelling to both legs and feet. (Doc. 35-4 at 101–102.) Defendant NP Coronado states that she was present at this dressing change,

---

[6] Cellulitis is "a spreading skin infection, most commonly of the lower leg . . . caused by bacteria entering through a break in the skin. . . . The infection can cause a fever and become very serious, involving deeper tissues." *See Mayo Clinic, Cellulitis*, https://www.mayoclinic.org/diseases-conditions/cellulitis/symptoms-causes/syc-20370762 (last visited March 25, 2026).

and she prescribed clindamycin hcl (antibiotic for bacterial infections) and a ceftriaxone sodium (antibiotic) injection to be given every day for three days. (*Id.* at 109–110; Doc. 35-3 at 5, Coronado Decl. ¶ 21.)

Also on March 30, 2021, Defendant NP Coronado submitted a consult request, priority urgent, for Plaintiff to see offsite orthopedics. (Doc. 35-4 at 99.) NP Coronado noted the request was "for a 1-week FU [follow up] as per ortho recommendations 2 weeks s/p R hip replacement with cellulitis of massive area on R hip." (*Id.*)

On March 31, 2021, NP Coronado ordered more labs. (*Id.* at 111.)

On April 1, 2021, Plaintiff saw Nurse Henderson for a dressing change. (*Id.* at 123.) Plaintiff reported that he slept well, but he still had a lot of drainage. (*Id.*) Nurse Henderson documented copious amount of serous sanguineous fluid and that the dressing was saturated. (*Id.* at 124.) Nurse Henderson assessed "alteration in skin integrity." (*Id.* at 126.)

On April 2, 2021, NP Coronado was present when Nurse Henderson conducted another dressing change. (*Id.* at 130–131.) Nurse Henderson documented that Plaintiff was able to ambulate independently, his gait was steady, staples were intact, and there was minimal drainage. (*Id.* at 131.)

On April 5, 2021, the urgent consult request for the follow up with PA Whatcott, which was submitted on March 30, 2021, was authorized. (Doc. 35-4 at 100.)

On April 7, 2021, Defendant NP Coronado issued an order for follow-up labs. (Doc. 35-4 at 140.)

On April 8, 2021, Plaintiff saw PA Whatcott for follow up. (Doc. 35-1 at 26.) PA Whatcott noted Plaintiff had a complex right total hip arthroplasty on March 8, 2021 and had copious amounts of drainage at the follow-up appointment. (*Id.*) PA Whatcott wrote that Plaintiff was put on oral antibiotics with orders for regular dressing changes, and that Plaintiff now reports continued drainage since then. (*Id.*) PA Whatcott wrote that Plaintiff reported episodes of fever waking him up with sweat soaked clothing. (*Id.*) PA Whatcott noted that Plaintiff had increased swelling in both lower extremities. (*Id.*) PA Whatcott

performed an exam and documented that Plaintiff's symptoms were likely due to a deeper infection, and that Plaintiff wished to continue with an irrigation and debridement surgery. (*Id.* at 27.)  On the Centurion Practitioner Consultation Report form, dated April 8, 2021, PA Whatcott wrote that Plaintiff needed surgery and IV antibiotics, and to continue antibiotics and dressing changes until Plaintiff was available for surgery.  (*Id.* at 28.)

On April 13, 2021, Defendant NP Coronado submitted a consult request, priority urgent, for Plaintiff to undergo irrigation and debridement surgery recommended by Whatcott.  (Doc. 35-4 at 148, 152, 154.)

On April 14, 2021, authorization was given for the surgery.  (*Id.* at 154.)

On April 16, 2021, Defendant NP Coronado renewed a 30-day prescription for Extra Strength Tylenol three times a day.  (*Id.* at 162.)

Also on April 16, 2021, blood was drawn pursuant to Defendant NP Coronado's April 7, 2021 order.  (*Id.* at 146.)  The results showed that hematocrit, hemoglobin, and red blood cell count were all low, but lymphocytes and neutrophils were normal.  (*Id.* at 146–147.)

On April 19, 2021, Plaintiff underwent irrigation and debridement surgery on his right leg.  (Doc. 67-1 ¶ 86.)[7]  He was hospitalized for four days and released on April 22, 2021.  (*Id.* ¶ 87.)

On April 25, 2021, Plaintiff saw Nurse Henderson for a wound check of the right hip incision.  (Doc. 35-4 at 171.)  Nurse Henderson noted that the dressing was intact and not soiled, and she assessed "risk for infection."  (*Id.* at 171, 173.)

Also on April 25, 2021, Plaintiff submitted an HNR stating that he walked around with an infection in his right leg, which he contracted in the infirmary, from March 15, 2021, until he had a second surgery on April 19, 2021, to remove the infection.  (Doc. 67-1 at 43.)  Plaintiff requested a full body CAT scan to determine if other organs were infected by the month-long infection.  (*Id.*)

---

[7] Defendants submitted only the discharge instructions from Plaintiff's four-day hospitalization.  (Doc. 35-1 at 30–62.)

On April 27, 2021, Plaintiff saw Defendant NP Coronado. (*Id.* at 177.) NP Coronado documented that Plaintiff reported feeling well and that his hip just started draining the day before. (*Id.*) NP Coronado assessed cellulitis of right lower limb following surgical irrigation and debridement. (*Id.* at 180.) That same day, NP Coronado submitted a consult request, priority urgent, for Plaintiff to return for a 1-2 week surgery follow up. (*Id.* at 184, 190.) It turned out that the follow-up appointment had already been approved. (*Id.* at 192–192.)

On May 6, 2021, Plaintiff saw PA Whatcott for follow up. (Doc. 35-1 at 63.) PA Whatcott noted Plaintiff's report that his pain and symptoms had improved significantly since surgery. (*Id.*) Upon examination, PA Whatcott found that the staples were in place and intact and there was no swelling. (*Id.*) PA Whatcott removed the staples and applied steri-strips, recommended range of motions exercises, and ordered another follow up in 6 weeks. (*Id.* at 64.) On the Centurion Practitioner Consultation Report form, PA Whatcott recommended right hip physical therapy and follow up in 6 weeks. (*Id.* at 66.)

On May 7, 2021, Defendant NP Coronado submitted consult requests, priority routine, for Plaintiff to see the offsite orthopedics specialist for follow up and to have physical therapy. (Doc. 35-4 at 195, 199, 201, 205, 207, 209.)

On May 9, 2021, Plaintiff began to experience a burning sensation when he urinated, and his urine was darker in color. (Doc. 67-1 ¶ 90.)

On May 10, 2021, authorization was obtained for Plaintiff to go to physical therapy. (Doc. 35-4 at 210.)

Around May 10, 2021, Plaintiff began experiencing aches in both sides, sharp pains when standing up, and his urine was getting darker. (Doc. 67-1 at 50.)

On May 14, 2021, authorization was obtained for Plaintiff to go to an orthopedic follow-up appointment. (Doc. 35-4 at 208.)

On May 17, 2021, Plaintiff submitted an HNR seeking medical care because his symptoms were worsening. (Doc. 67-1 ¶ 91.)

On May 18, 2021, Plaintiff was summoned to medical, where Defendant NP

Coronado asked him some questions and he informed her he was experiencing chills and sweats at night. (*Id.* ¶ 92.) NP Coronado took a urine sample and sent Plaintiff back to the dorm. (*Id.*)

On May 24, 2021, Plaintiff submitted an HNR stating that he needed to be seen "real bad!" (Doc. 67-1 at 45.) He wrote that he had a urinary tract infection for days, his urine was orange, and it burned to urinate. (*Id.*) By this time, Plaintiff had been in bed all week suffering chills and sweats at the same time. (Doc. 67-1 ¶ 94.)

On May 25, 2021, Defendant NP Coronado issued an SNO for Plaintiff to have a wedge for support for his leg. (Doc. 35-4 at 211, 217.)

Also on May 25, 2021, Defendant NP Coronado submitted a consult request, priority routine, for Plaintiff to have physical therapy. (Doc. 35-4 at 218, 222.) The medical record notes that this request came after "alternative treatment completed." (*Id.* at 222.)

On Thursday, May 27, 2021, in response to his May 24, 2021 HNR, Plaintiff was seen by Nurse Henderson. (*Id.* at 224.) Nurse Henderson noted that she "discussed with Coronado NP," and NP Coronado ordered Macrobid (antibiotic) twice daily for ten days as well as a renewal of Extra Strength Tylenol. (*Id.* at 224, 230, 233, 234.) Plaintiff states that he saw NP Coronado, and she took another urine sample from him. (Doc. 67-1 ¶ 96.)

On May 31, 2021, Nurse Sarah Ziegler documented that Plaintiff's temperature that morning and early afternoon had been 99.0 and 100.8 respectively. (Doc. 35-4 at 244.) Nurse Ziegler wrote that, around 1:00 p.m., a verbal order was issued by Defendant NP Coronado for a ceftriaxone sodium injection, lactated ringers injection, and a ten-day prescription for ciprofloxacin. (*Id.* at 244, 247–248, 258–259.) The pharmacy record noted that NP Coronado ordered the ciprofloxacin for a urinary tract infection. (*Id.* at 258.) NP Coronado also ordered blood and urine labs. (*Id.* at 248, 250, 252, 254, 256.)

Around 2:00 p.m. that day, Plaintiff arrived at the Medical Hub via a wheelchair for the antibiotics and hydration therapy; he reported that he had been urinating blood and was very weak. (*Id.* at 260.) Defendant NP Coronado was notified that Plaintiff had a fever.

- 16 -

(*Id.* at 266.)  In addition to the antibiotics and hydration therapy, Plaintiff was administered a Toradol injection (pain medication).  (*Id.* at 265, 267.)  After the injection, Plaintiff was "medically cleared per NP" to return to the yard.  (*Id.* at 265.)

Later that night on May 31, 2021, Plaintiff was urinating red urine, sweating, and so sick that other prisoners made the officer who escorted the pill-call nurse initiate a medical ICS.  (Doc. 67-1 ¶ 97.)  Plaintiff was brought to medical around 11:30 p.m.  (Doc. 35-4 at 235.)  Plaintiff states that once he arrived at medical, staff called the Buckeye Paramedics, who examined Plaintiff, and then transferred him to the hospital.  (Doc. 67-1 ¶ 98; Doc. 66 at 8.)

In the May 31, 2021 medical record, Nurse Jennifer Roy documented that Plaintiff reported he had been dizzy and in bed since May 27, and that he had chills and sweats especially at night.   (Doc. 35-4 at 235.)  Nurse Roy noted that Plaintiff was sluggish and his affect was depressed.  (*Id.* at 236.)  Nurse Roy wrote that she "discussed with Coronado," and Plaintiff was advised to continue drinking plenty of water and taking prescribed antibiotics until his provider appointment.  (*Id.* at 242.)

According to Plaintiff, he was not examined by Defendant NP Coronado before transport to the hospital; he was only examined by the Buckeye Paramedics.  (Doc. 66 at 8.)

But Defendant NP Coronado made a medical entry documenting that she saw Plaintiff at 9:30 a.m. on June 1, 2021.  (Doc. 35-4 at 268.)[8]  NP Coronado wrote that Plaintiff reported he had not felt well for the prior week, his urine had gotten worse, his pain had increased, and he had fevers.  (*Id.* at 268.)  NP Coronado wrote that Plaintiff appeared ill looking and had tachycardia (increased heart rate).  (*Id.*)  NP Coronado assessed "urinary tract infection, site not specified, r/o [rule out] sepsis."  (*Id.* at 271.)  The "Plan Notes" stated that Plaintiff had a low-grade fever, slight tachycardia, and low blood

_____

[8] The only medical records submitted from Plaintiff's hospitalization were the discharge instructions.  (Doc. 35-1 at 67–77.)  Therefore, it is unclear what time on June 1, 2021 Plaintiff arrived at the hospital.

pressure, and "send out 911 r/o sepsis." (*Id.* at 272.)

Plaintiff was hospitalized from June 1 to June 7, 2021. (Doc. 35-1 at 67.) Plaintiff was under the care of Dr. Cecil, who informed Plaintiff that both his kidneys had shut down. (Doc. 67-1 ¶ 99.) After taking Plaintiff's history, Dr. Cecil contacted PA Whatcott to discuss Plaintiff's case. (*Id.* ¶ 101.) Dr. Cecil told Plaintiff that the infection he developed in March traveled through his bloodstream to his kidneys and that his condition was very serious. (*Id.* ¶ 102.) Plaintiff was diagnosed with sepsis, pyelonephritis (bacterial kidney infection), anemia, hypertension, hyperlipidemia, and hematuria (blood in urine). (Doc. 35-1 at 68.) Plaintiff was given a blood transfusion and intravenous antibiotics. (Doc. 67-1 ¶ 99.)

On June 9, 2021, Plaintiff saw Defendant NP Coronado for a chronic care clinic appointment to address hypertension and elevated PSA levels. (Doc. 35-4 at 278.) Plaintiff reported that he was feeling well. (*Id.*)

On July 15, 2021, Plaintiff saw Defendant NP Pfingston. (Doc. 35-9 at 2.) NP Pfingston noted that Plaintiff was using one crutch, and he had difficulty sitting in a chair without assistance. (*Id.*) NP Pfingston documented Plaintiff's reports that he was weak in his lower extremities, especially on the right side, and that he felt unsafe ambulating without assistance. (*Id.*) Plaintiff requested further physical therapy. (*Id.*) NP Pfingston assessed pain in the right hip. (*Id.* at 4.) NP Pfingston issued an order for offsite physical therapy. (*Id.*)

On September 7, 2021, Plaintiff saw Defendant NP Pfingston. (Doc. 35-9 at 7.) NP Pfingston documented that Plaintiff was feeling well, he would like more physical therapy, and that his left, lower extremity was still swollen. (*Id.*) NP Pfingston ordered a renal ultrasound to rule out any kidney abnormalities. (*Id.* at 10.)

## V.     Eighth Amendment Standard

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are

two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard.  First, a prisoner must show a "serious medical need."  *Id.* (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).  Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."  *Id.* at 1059–60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent.  *Jett*, 439 F.3d at 1096.  A prison official is deliberately indifferent to a serious medical need if he "knows of and disregards an excessive risk to inmate health."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  This prong is satisfied by showing "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."  *Id.*  "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'"  *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)).  "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'"  *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference.  *Jett*, 439 F.3d at 1096; *see Hunt*, 865 F.2d at 200 (delay in providing medical treatment does not constitute Eighth

Amendment violation unless delay was harmful). But a prison need not show that his harm was substantial. *Jett*, 439 F.3d at 1096.

## VI.    Discussion

### A.    Serious Medical Need

Defendants do not argue that Plaintiff's condition following his total right hip replacement surgery did not constitute a serious medical need. (*See* Doc. 37.) Plaintiff had 38 staples on his right leg/hip, required post-op care and follow up specialist care, suffered a major infection that required a second surgery, and ultimately suffered sepsis and kidney failure after the infection entered his blood stream. Moreover, he suffered burning pain, swelling, and limited mobility. On this record, Plaintiff had serious medical needs. *See McGuckin*, 974 F.2d at 1059–60.

### B.    Deliberate Indifference

The second prong in the analysis examines whether Defendants were deliberately indifferent to Plaintiff's serious medical needs. The inquiry into an individual defendant's liability for deliberate indifference "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988); *see Rizzo v. Goode*, 423 U.S. 362, 370–71, 375–77 (1976).

#### 1.    Dr. Paul

Defendants' argument that Dr. Paul was not deliberately indifferent to Plaintiff's serious medical needs is based on their version of the facts; that is, that Dr. Paul never saw any swelling, that Plaintiff never expressed to her that his leg was swollen and burning, and that she did not interact with Plaintiff after the ICS was activated on March 22, 2021. (Doc. 37 at 20.) But Plaintiff disputes these facts, and, at summary judgment, the Court must take Plaintiff's verified statements based on personal knowledge as true.

According to Plaintiff's facts, when Plaintiff saw Dr. Paul on March 15, 2021, he immediately informed her that his right leg was swollen, aching, and burning with pain, and that he thought his leg was infected. (Doc. 67-1 ¶¶ 35, 37; Doc. 67-1 at 48.) These

- 20 -

were new symptoms that had developed since Dr. Paul had seen Plaintiff on March 12, 2021. In response to Plaintiff's new symptoms, Dr. Paul stated it was post-op fluid that would drain on its own, and she made no change to Plaintiff's plan of care. (*Id.*; Doc. 35-6 at 12.) A week later, on March 22, 2021, Dr. Paul saw Plaintiff after he was brought to the Medical Hub for the ICS. (Doc. 67-1 ¶¶ 53–54.) At this time, both of Plaintiff's legs were swollen and burning, and Plaintiff had large blisters on his right foot. (Doc. 35-2 at 133–134.) Dr. Paul opined again that it was just post-op swelling, despite Plaintiff's report that he never experienced such symptoms with prior hip surgeries. (Doc. 67-1 ¶¶ 54–55.)

On this record, Plaintiff has stated under oath that Dr. Paul was aware of Plaintiff's pain and swelling, was aware that swelling affected both legs, knew that blisters developed on Plaintiff's foot, and knew that Plaintiff's symptoms were worsening despite being two weeks post surgery. A reasonable jury could find that Dr. Paul was subjectively aware of Plaintiff's serious medical needs.

Further, even if Dr. Paul failed on her own to infer the serious risk of harm to Plaintiff from an infection due to his post-op status, the medical records repeatedly assessed a risk of infection. (*See, e.g.*, Doc. 35-2 at 38, 47, 56, 65, 83, 92.) For purposes of summary judgment, the Court infers that Dr. Paul was aware of Plaintiff's medical records documenting his post-op status and his ongoing risk for infection. *See Jett*, 439 F.3d at 1094, 1097 (finding that as the party opposing summary judgment, the plaintiff was entitled to an inference that the defendant prison doctor was aware of information in the plaintiff's medical records and aware of medical slips the plaintiff continued to submit asking to be sent to a specialist for treatment for a fractured thumb). The record shows that, despite the known risk of infection, and in response to Plaintiff's aching and burning pain, and swelling that eventually affected both legs, Dr. Paul did not make any change to Plaintiff's treatment.

Other courts have found that liability for deliberate indifference in situations where a prisoner displayed pain and worsening symptoms, and was ultimately found to have a septic infection, turned on whether the provider took steps to determine the cause of pain

and made attempts to treat the prisoner's symptoms. For example, in *Padro v. Shakir*, the prisoner underwent arthroscopic knee surgery, and after ten days, he suddenly developed swelling, bruising, and increased pain. No. 15-7096 (MAS) (DEA), 2021 WL 3713011, at *1–2 (D.N.J. Aug. 20, 2021). Prison medical staff gave the prisoner an antibiotic, and three days later, when labs showed an elevated white blood cell count, the prisoner was taken to the hospital, where more antibiotics were prescribed. *Id.*, at *2. A couple weeks later, a provider concluded that, because there was no redness or liquid in the knee joint, the prisoner did not have an infection, but the provider administered a cortisone shot for pain. *Id.*, at *2. The prisoner was then sent to physical therapy, but his swelling and pain persisted. *Id.* At a follow-up appointment eleven weeks after the knee surgery, the provider suspected that the prisoner's significant pain and fluid in the knee joint were from an infection, and the prisoner was sent to the hospital where he was diagnosed with a septic knee joint and underwent surgery to remove the fluid and damaged tissue. *Id.* The prisoner alleged that the treating providers were deliberately indifferent when they missed or misdiagnosed a post-operative knee infection. *Id.* at *7. The district court determined that the providers were not deliberately indifferent because they treated the prisoner with antibiotics when it appeared he had an early-stage infection and subsequently provided treatment and a cortisone shot for pain. *Id.*

In *Webster v. Lombardo*, the plaintiff underwent knee surgery a year before he entered jail. No. 3:20-cv-00070-ART-CSD, 2023 WL 10669009, at * 1 (D. Nev. Sept. 12, 2023). After he entered jail, the plaintiff complained of pain and swelling, and he received evaluations, an ACE wrap, various anti-inflammatories and muscle relaxers, multiple x-rays, a knee brace, a lower bunk assignment, an extra blanket to elevate his knee, and pain medication. *Id.*, at *10. When the plaintiff later complained of excessive swelling, and presented with classic signs of infection, he was transferred to the hospital and underwent surgery for a periprosthetic joint infection. *Id.* The court found that the jail providers were not deliberately indifferent because they attempted to ascertain the cause of the plaintiff's symptoms with several rounds of imaging and they provided him with various treatments.

*Id.*

Here, the only action Dr. Paul took in response to Plaintiff's pain was on March 16, 2021, when she renewed his Tylenol 3 prescription. At that time, Dr. Paul took no steps, such as imaging or labs, to confirm her opinion that Plaintiff merely had post-op swelling, even though Plaintiff's symptoms had exacerbated since her encounter with him on March 12, 2021. There is no evidence that, on March 22, 2021, Dr. Paul took any action when she allegedly observed Plaintiff's significant swelling in both legs and continued pain that was not alleviated by Tylenol 3. Dr. Paul did not prescribe antibiotics, she did not order x-rays or other imaging to attempt to ascertain the cause of Plaintiff's pain and swelling, she did not prescribe any other pain medication, and she did not provide any medical devices (e.g., wraps, ice, wedge) that might have alleviated Plaintiff's pain. (Doc. 35-6 at 12.) On this record, a reasonable jury could find that Dr. Paul exhibited deliberate indifference to Plaintiff's serious medical needs. *See Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 680 (9th Cir. 2021) (finding deliberate indifference where a nurse made no effort to determine why the prisoner was suffering serious symptoms and made no attempt to treat those symptoms: "this is not a case where a nurse mistakenly misdiagnosed a patient after reasonably attempting to ascertain the cause of unexplained symptoms").

As to the harm element, Defendants argue that, even assuming there is a question of fact regarding deliberate indifference by Dr. Paul, Plaintiff fails to show that he suffered harm as a result. (Doc. 37 at 21–22.)

Plaintiff states that, by March 15, 2021, he was experiencing excruciating pain; by March 22, 2021, both his legs and feet were swollen and his legs burned so bad that an ICS was initiated; and he continued to suffer pain, swelling, blisters on his feet, and burning in his legs before he was finally diagnosed with an infection and prescribed antibiotics by PA Whatcott on March 25, 2021. (Doc. 67-1 ¶¶ 31, 33, 37, 44, 49, 58, 73). A reasonable jury could believe Plaintiff's allegations and find that he suffered harm as a result of Defendant Dr. Paul's deliberate indifference. *See Estelle*, 429 U.S. at 103; *McGuckin*, 974 F.2d at 1060 (pain and anguish suffered by prisoner constituted harm sufficient to support a § 1983

action).  Accordingly, Defendants' Motion for Summary Judgment will be denied as to the medical care claim against Dr. Paul.

### 2.    NP Coronado

Defendants argue that, in response to Plaintiff's serious medical needs, Defendant NP Coronado ordered extensive diagnostic testing, followed through on orthopedic recommendations, and made decisions based on clinical findings.  (Doc. 37 at 19.) Defendants also deny that NP Coronado saw Plaintiff on March 22, 2021 just before the ICS.  (*Id.* at 19–20.)  According to Defendants, Plaintiff's allegation that he saw NP Coronado the day before the ICS is not reliable and should be discounted because Plaintiff alleged that an ICS was activated on March 23, 2021, when, in fact, the ICS was activated on March 22, 2021.  (Doc. 37 at 20.)

There is no dispute that an ICS was activated regardless of whether Plaintiff was incorrect as to the exact date of the ICS.  Plaintiff's claim that he saw NP Coronado the day before the ICS is not belied by his mistake as to the dates of the ICS and his interaction with NP Coronado.  Rather, his claim is subject to a credibility determination, which the Court cannot make at summary judgment.  Taking Plaintiff's allegations as true, when he saw NP Coronado the day before the ICS, and asked her for something to ease the pain caused by burning nerves in his legs, she gave him Tylenol and a jar of skin cream.  (Doc. 67-1 47–48.).  Again, NP Coronado seemingly disputes that she provided this treatment.

The medical records show that during Defendant NP Coronado's encounters with Plaintiff after PA Whatcott diagnosed Plaintiff with a severe infection, NP Coronado regularly ordered labs to monitor his status; followed the specialist's recommendations for antibiotics, wound care, and follow ups; prescribed additional antibiotics as well as Extra Strength Tylenol, aspirin, and a Toradol shot for pain; ordered physical therapy; and provided a wedge for support.  (*See, e.g.*, Doc. 35-4 at 28, 29, 48, 45, 74, 98, 150–151, 195, 211, 218.)  NP Coronado avers that she provided the medications and treatment she determined in her medical discretion were warranted.  (Doc. 35-3 at 9, Coronado Decl. ¶ 43.)  Plaintiff's condition nonetheless worsened, and he was ultimately hospitalized with

sepsis and a kidney infection which lead to kidney failure.

The record supports that NP Coronado did not comprehend the severity of Plaintiff's worsening condition, and she misdiagnosed his symptoms as post-op swelling at first and later as a urinary tract infection. Under the law, neither incompetence nor negligence in diagnosing or treating a medical condition are sufficient to support a constitutional violation. *Estelle*, 429 U.S. at 106; *Montague v. Jackson*, No.: 2:16-cv-01680-JAD-CWH, 2018 WL 11241971, at *3 (D. Nev. April 26, 2018) (neither incompetence nor negligence are sufficient to show deliberate indifference). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. *See Wood*, 900 F.2d at 1334.

The record reflects that NP Coronado responded to and attempted to treat Plaintiff's condition and pain. Thus, the issue before the Court is whether NP Coronado's ineffective treatment can, as a matter of law, be categorized as, at most, incompetence or gross negligence entitling her to summary judgment.

The Court finds that between when Plaintiff first started complaining of symptoms that were consistent with a post-op infection on March 15, 2021,[9] and Plaintiff's June 1, 2021, hospitalization for kidney failure and sepsis from the post-op infection, a jury could conclude that NP Coronado's actions rose to deliberate indifference by not taking more urgent or aggressive action in the face of Plaintiff's deteriorating condition. *See Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (noting that failure to provide *competent* treatment for a serious medical condition, even if some treatment is provided, may constitute deliberate indifference in a particular case). Thus, summary judgment will be denied as to the medical care claim against NP Coronado.

### 3.    NP Pfingston

Defendants argue that Defendant NP Pfingston cannot have acted with deliberate

---

[9] The Court recognizes that Defendants dispute whether NP Coronado saw Plaintiff between March 11 and March 26, 2021. However, for purposes of her treatment even after March 25, 2021, at summary judgment, the Court infers that NP Coronado was aware of Plaintiff's medical records documenting his post-op status and his ongoing risk for infection. *See Jett*, 439 F.3d at 1094, 1097.

indifference because she was not involved in Plaintiff's care during the relevant time frame. (Doc. 37 at 20–21.)  The medical records show that NP Pfingston saw Plaintiff on July 21, 2021, and September 7, 2021, at which times she ordered physical therapy and an ultrasound to address Plaintiff's pain and continued lower extremity swelling.  (Doc. 35-9 at 4, 7, 10.)  NP Pfingston avers that the only time she provided care to Plaintiff was at the July and September 2021 encounters.  (Doc. 35-8, Payne Decl. ¶ 7.[10])

Plaintiff asserted generally that Defendant NP Pfingston was one of the main caretakers at the Stiner Unit after Plaintiff was discharged from the infirmary, and that NP Pfingston saw his swollen legs and feet but ignored his obvious symptoms of an infection. (Doc. 67-1 ¶¶ 74–76.)  But Plaintiff did not indicate the exact dates he saw NP Pfingston or provide any detail regarding his encounters with her.  In his Response Memorandum, Plaintiff did not respond to Defendants' argument for summary judgment on the claim against NP Pfingston, and he appears to have abandoned the claim against her.  (*See* Doc. 66 at 1.)

Defendants have submitted evidence that NP Pfingston was not involved in Plaintiff's care prior to his June 2021 hospitalization for sepsis, and that her treatment in July and September 2021 did not constitute deliberate indifference.  Because Plaintiff has not responded to and rebutted this evidence, summary judgment will be granted on the medical care claim against NP Pfingston.

**IT IS ORDERED:**

(1)	The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 37).

(2)	Defendants' Motion for Summary Judgment (Doc. 37) is **granted in part** and **denied in part** as follows:

(a)	the Motion is **granted** as to the claims against Defendant NP Pfingston; and

---

[10] NP Pfingston has changed her last name to "Payne."  (Doc. 35-8 at 2, Payne Decl.)

- 26 -

(b)      the Motion is otherwise **denied**.

(3)      Defendant NP Pfingston is **dismissed** as a Defendant.

(4)      The remaining claims for trial are the Eighth Amendment medical care claims against Defendants Dr. Paul and NP Coronado.

(5)      This action is referred to Magistrate Judge John Z. Boyle to conduct a settlement conference.

(6)      Defense counsel shall arrange for the relevant parties to jointly call Magistrate Judge Boyle's chambers at (602) 322-7670 within 14 days to schedule a date for the settlement conference.

Dated this 30th day of March, 2026.

James A. Teilborg
Senior United States District Judge